UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA                CRIMINAL NO.  10-cr-00131

VERSUS                                  JUDGE FOOTE

UNDRE DEVON McCURDY                     MAGISTRATE JUDGE HORNSBY


**REPORT AND RECOMMENDATION**

Defendant is charged with one of count of being a felon in possession of a firearm. He was arrested at the Shreveport Greyhound Bus Station after police officers discovered a stolen firearm in his backpack. Before the court is Defendant's Motion to Suppress. Doc. 25. He argues that the firearm was discovered during an illegal search and seizure. He seeks to suppress the firearm as well as statements he made to the officers during (and after) the encounter. For the following reasons, it is recommended that Defendant's motion be denied.

**Factual Background**

An evidentiary hearing was held on July 30, 2010. The evidence at the hearing established the following facts. Lt. Carl Townley, a 26-year veteran of the Caddo Parish Sheriff's Office, conducted a routine drug and weapons interdiction at the Greyhound Bus Station in Shreveport, Louisiana on April 7, 2010. Lt. Townley was assisted by Agent Matt Sharpley, Agent Steve McKenna, and Cpl. James McLamb (and McLamb's K-9). Tr. 5. Lt. Townley obtained permission from the manager of the bus station to check the buses for

illegal activities. Tr. 7. Lt. Townley has conducted hundreds of similar operations at the bus station, and the bus station's management welcomes the police's presence. Tr. 7-8.

At approximately 11:30 a.m., a bus from Birmingham, Alabama made its scheduled arrival in Shreveport. Tr. 9. As soon as the bus arrived, Lt. Townley approached the driver, showed his identification, and asked the driver's permission to enter the bus and speak to the passengers. The bus driver, on his own initiative, used the public address system to ask his passengers to remain in their seats until Lt. Townley was finished talking to them. Tr. 9. The passengers had started to get out of their seats, but in response to the bus driver's statements, they sat back down so Lt. Townley could speak to them. Tr. 10.

Lt. Townley, was, like the other officers present, dressed in plain clothes. Townley introduced himself to the bus passengers and showed his badge and police identification. He welcomed the passengers to the "fair City of Shreveport," and advised them that, in an effort to stop the flow of illegal drugs and other items into Shreveport, the police conduct checks at the bus station. Tr. 10. According to Lt. Townley:

> I advise[d] them that the K-9 they may or may not have noticed will be checking the exterior of the bus and may possibly come on the bus at a later time. The K-9 may or may not be at the exit when they exit the bus; and if he is there, "would you mind -- if you carry your luggage off, would you mind to present them -- present it to the K-9 so that he can check it. Also, I have some agents that will be walking around that may or may not talk to you. If you do not mind, I would appreciate any cooperation that you can give them."

Tr. 10-11. Lt. Townley did not order the passengers to exit the bus. However, the bus driver, again on his own initiative, instructed the passengers to exit the bus. Tr. 11-12. This was done to secure the bus and prevent the theft of carry-on items. Tr. 11.

As Lt. Townley was making his announcement to the passengers on the bus, Agent Sharpley and Agent McKenna were standing outside, on the side of the bus, watching the passengers. Before the bus arrived, the agents determined that Agent Sharpley would observe the passengers from the rear of the bus to the middle of the bus, and Agent McKenna would observe the passengers from the front of the bus to the middle of the bus. Tr. 28, 31.

Agent Sharpley, a 14-year veteran of the Shreveport Police Department and a member of the Caddo-Shreveport Narcotics Task Force, has participated in more than 30 bus station operations in the past. Tr. 29. Sharpley testified that, as Lt. Townley made his announcement to the bus passengers, he (Sharpley) observed Defendant mouth what appeared to be the words, "Oh Fuck." Tr. 31. Agent Sharpley, who is 6'2" (Tr. 51), also observed Defendant twitch in his seat and move around. Sharpley observed Defendant's jacket flutter or protrude as if Defendant was putting something behind the jacket. Tr. 32. According to Sharpley, Defendant's actions were not common for someone who was simply trying to get up and leave the bus. Tr. 32. Agent Sharpley also saw Defendant handling a backpack. According to Agent Sharpley:

> I saw him first grab the backpack and sit it in his lap, and then sit the backpack down, grab it back in his lap, and then -- he turned his back towards -- I guessed you'd say pointing towards

> the entrance area where the passengers would go, his back to me. And then after that, I couldn't tell what he was doing.

Tr. 32-33. Based upon those observations, Agent Sharpley decided that he was going to talk to Defendant. Tr. 33.

Meanwhile, as the passengers begin to exit, Lt. Townley positioned himself in the front passenger seat, opposite the driver, so that he could observe the passengers as they left the bus. Tr. 12. Lt. Townley noticed Defendant walk past him carrying a backpack over his shoulder. According to Lt. Townley:

> But I did notice when he came off the bus that he had a backpack slung over his shoulder, and he kind of -- when he got off the bus, it was almost like he made a little bit of -- it was his intention to kind of pull the backpack away from me when he walked off. Because I notice things that people try and skirt around me. He had that backpack trying to -- like, trying to avoid me.

Tr. 12-13.

Defendant exited the bus and walked about 20 feet toward the entry to the bus station terminal. Tr. 33. Agents Sharpley and McKenna approached Defendant. Agent Sharpley showed Defendant his badge and identification and asked Defendant if he could talk to him for a minute. Tr. 33-34. Agent Sharpley then immediately asked Defendant if he had anything illegal on his person. Tr. 34. Defendant responded that he did not. As Defendant spoke, his voice was calm, but Agent Sharpley saw that Defendant's hands were shaking as he held onto the backpack. Tr. 34.

Agent Sharpley then asked Defendant if he had anything in the backpack that was illegal that Sharpley needed to know about. Tr. 35. At that point, Defendant put the backpack on the ground and stepped backwards away from the backpack. Tr. 35. Agent Sharpley interpreted Defendant's actions in backing away from the backpack as "denying the property." Tr. 35. Defendant then stated, "It's not mine." Tr. 36, 57. Agent Sharpley told Defendant that he had noticed that no one was sitting with Defendant on the bus. Tr. 37. Agent Sharpley then asked: "Well, if the bag is not yours, do you mind if I look in it?" Tr. 36. According to Agent Sharpley:

> That was about the time that I was bending down to check the backpack and when I made the statement of, you know, "if it's not yours, you don't mind if I look in it?" I attempted to grab the zipper, and he uttered to me that there's a firearm in the bag -- or weapon -- he said "gun."

Tr. 37. As soon as Defendant stated there was a gun in the backpack, he was immediately handcuffed, and the weapon was secured. Tr. 39. Sharpley advised Defendant of his rights, and Defendant was moved into the baggage handling room of the bus station terminal. Tr. 41.

Agent Sharpley went to his patrol car to check Defendant's criminal history and the serial number of the gun. Agent Sharpley learned that the firearm was reported stolen in Alabama and that Defendant had at least three prior felony convictions. Tr. 43. During this time, Lt. Townley was left alone with Defendant in the baggage handling area. Townley also advised Defendant of his rights, "just in case he made any other statements to anybody."

Tr. 15. Defendant appeared to understand his rights, and he was very amiable and cooperative during the encounter. Tr. 16-17, 42.

Agent Sharpley returned to the baggage handling area and asked Defendant where he obtained the gun. Tr. 43. Defendant reported that he purchased it from somebody off the street in Alabama for $50. Tr. 43-44. Defendant stated that he had just been released from a federal penitentiary in Alabama. His wife or girlfriend was to pick him up in Alabama and drive him home to Las Vegas (Tr. 71), but they got into an argument, which led to Defendant to take a bus home. Tr. 45. Defendant stated he purchased the firearm for protection prior to getting on the bus. Id.

Defendant was transported to the Shreveport City Jail, and his backpack and luggage were inventoried and placed in the Shreveport Police property room. Tr. 46-48. Later that day, ATF Agent Ronald Meadows interviewed Defendant. Tr. 68. Defendant signed an advice of rights waiver form before the interview. Tr. 69; Gov. Exhibit 4. A disk containing a recording of the interview was introduced at the hearing as Government Exhibit 5. Tr. 70. During the recorded interview, Defendant made additional incriminating statements.

**Defendant's Motion to Suppress**

Defendant argues that the officers' actions at the bus station constituted an unlawful seizure. Defendant argues there was no constitutional basis for the seizure of his person or the subsequent seizure and search of his backpack. Defendant also argues there was no reasonable, objective grounds for stopping and questioning Defendant outside the bus.

According to Defendant, Agent Sharpley's observations, even if credited in their totality, amount to nothing more than a mere hunch and do not rise to the level of reasonable suspicion of an ongoing or imminent crime. Finally, Defendant argues that all of his statements made after his unlawful seizure and the search of the backpack should be suppressed as fruit of the poisonous tree.

The Government argues that the firearm was discovered pursuant to a consensual encounter with Defendant. The Government also argues that the totality of the circumstances justified further contact with Defendant because there was reasonable suspicion that a crime was occurring or about to occur. The Government contends that the search of the backpack was proper based on consent, reasonable suspicion, probable cause, and search incident to arrest. Finally, the Government argues that the firearm would have inevitably been discovered when the backpack was inventoried and placed into the evidence room.

**<u>Terry</u> Stops; Consensual Encounters**

The law is well settled that a police officer may conduct a brief, investigatory stop when he has reasonable, articulable suspicion of criminal activity. <u>United States v. Lawson</u>, 233 Fed. Appx. 367, 369 (5th Cir. 2007), citing <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the seizure. <u>United States v. Pack</u>, ___ F.3d ___, 2010 WL 2777061 (5th Cir. 2010). In evaluating reasonable suspicion, due weight must be given to the specific reasonable

inferences which the officer is entitled to draw from the facts in light of his experience. Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence. Id.

On the other hand, an officer need not have such minimal level of objective justification before asking an individual if he is willing simply to talk to the officer. Lawson, supra. Under the consensual encounter arm of the Fourth Amendment jurisprudence, the police can initiate contact with a person without having an objective level of suspicion, during which time the police may ask questions of the person, ask for identification, and request permission to search baggage that the individual may have in his possession. Lawson, supra, citing United States v. Williams, 365 F.3d 399, 404 (5th Cir. 2004). The individual, however, has a right to ignore the police and "go on his own way." Florida v. Royer, 460 U.S. 491, 498 (1983). Thus, an encounter with the police is consensual so long as a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter. United States v. Gurrola, 301 Fed. Appx. 337, 341 (5th Cir. 2008), citing United States v. Drayton, 536 U.S. 194, 202 (2002).

**Consensual Bus Station Encounters**

The Supreme Court has recognized that the Fourth Amendment "permits police officers to approach bus passengers at random to ask questions and to request their consent to searches, provided a reasonable person would understand that he or she is free to refuse."

Drayton, 536 U.S. at 197. In Drayton, the officers were engaged in a routine drug and weapons interdiction on a Greyhound bus during a scheduled stop. The Supreme Court concluded that the bus passengers were not seized when officers boarded the bus and began questioning passengers. The court based its conclusion on an analysis of the totality of the circumstances, noting that there was nothing coercive or confrontational about the encounter. The court observed that there was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, and not event an authoritative tone of voice.

The Fifth Circuit has addressed police operations at the Shreveport Greyhound bus station in at least two prior cases: United States v. Williams, 365 F.3d 399 (5th Cir. 2004) and United States v. Jackson, 390 F.3d 393 (5th Cir. 2004). In Williams, Lt. Townley, along with other deputies and their K-9s, were conducting an operation at the Shreveport bus station. As Townley was checking the luggage compartment beneath the passenger cabin with his K-9, he noticed that the defendant (Williams) avoided the dog as he exited the bus. He also took note of Williams's interest in and curiosity about the dog's investigation of the luggage within the bus. Based on Williams's mannerisms, Townley commented to another officer that it might be useful to talk to him.

A deputy approached Williams and asked if he would mind talking with him. Williams followed the deputies into the baggage handling area of the bus station terminal. The deputies identified themselves as police officers and again asked Williams if he would

talk with them. Williams stated that he had no problem doing so. The deputies asked Williams about his travel plans. Williams stated he was on leave from the military.

The deputies asked Williams if he had any illegal narcotics or contraband on his person or in his luggage. He admitted that he had smoked marijuana before boarding the bus, but stated he had none in his carry-on bag which was located on the bus. Williams agreed to retrieve his bag from the bus. The deputies noted that Williams's bag was the same bag that one of the K-9s had alerted to earlier.

Williams eventually admitted to the deputies that he lied about his military service and became unusually insistent that there was no marijuana in his backpack. Townley testified that, based on Williams's reaction, he believed there was something else illegal in the backpack. The deputies then asked for consent to search the backpack, informing Williams that the K-9 had alerted to it. Williams told the officers, "Go ahead, look in the bag." The deputies searched the bag and discovered a concealed weapon. An ATF agent was summoned to the scene and discovered that Williams was under indictment for a felony.

The Fifth Circuit found that Williams's initial agreement to talk with the deputies was a permitted consensual encounter that did not implicate the Fourth Amendment. Williams, however, argued that the consensual nature of the encounter ended when he was requested by the officers to speak with them in the baggage handling area of the bus station terminal. The Court was not persuaded, and it found that the purpose for moving Williams into the

baggage handling area for questioning was to get away from the loud noise made by the buses at the terminal.

The Court also found that the baggage handling area was not a restrictive environment. That area opened directly to the open-air area of the terminal, and there were several baggage handlers in the room with Williams and the officers at the time of the questioning. Therefore, Williams's voluntary entry into the baggage handling area for purposes of answering questions did not amount to a seizure, nor did it convert the consensual encounter into a Terry stop.

The Court also found that there was nothing coercive about the deputies' questions. The officers did not demand answers to their questions, leaving Williams free to decide whether to answer. The officers were not in uniform, displayed no weapons, and by all accounts maintained a professional decorum.

In United States v. Jackson, Caddo Sheriff's deputies, including James McLamb, were working another operation at the Shreveport bus station when a bus arrived from Dallas, Texas. The deputies obtained permission from the bus driver to search the bus for illegal narcotics. A deputy announced over the public address system that a narcotics officer and K-9 would search the bus for drugs. The deputy advised the passengers that they could either remain on the bus during the search or depart before the dog was brought aboard. The passengers were further advised that they could either leave their carry-on bags on the bus or take them as they departed. All of the passengers chose to disembark.

The deputies observed that the defendant (Jackson) was behaving in a nervous manner. After all the passengers had exited the bus, a K-9 boarded the bus and conducted a search. The dog alerted on an empty seat, so Deputy McLamb suspected that someone was "body-carrying" drugs.

The deputies entered the bus station terminal and approached Jackson. They again observed that Jackson appeared nervous, was sweating heavily, and was having difficulty breathing. A deputy approached Jackson and asked whether he could speak with him. Jackson agreed but appeared so nervous that the deputy asked whether he would prefer to talk in a more private place. Jackson again agreed, so the deputy led him to the baggage claim area. There, the deputy asked Jackson whether he was carrying any weapons. Jackson answered that he was not.

The deputy then conducted a pat-down search during which he felt an unknown object around Jackson's waist. The deputy then handcuffed Jackson and asked him to identify the object. Jackson told the officers that it was a back brace. Deputy McLamb then raised Jackson's shirt to investigate, and he observed powder cocaine in plastic bags taped to his waist.

The Fifth Circuit rejected Jackson's arguments that he was subjected to an unconstitutional seizure when the officers boarded the bus and instructed the passengers that they could remain on the bus or disembark until the search was completed. According to the court, the officers' initial contact with Jackson was justified because it was a consensual

encounter. The court stated that nothing about the officers' conduct impaired Jackson's right (which he exercised) to leave the bus and terminate the encounter with the police. Nothing the officers did or said would suggest to a reasonable person that he or she was barred from leaving the bus or otherwise terminating the encounter.

The Fifth Circuit also found that the Terry pat-down of Jackson was justified by reasonable and particularized suspicion that Jackson was a drug courier. The officers were aware that the dog had alerted and that one of the passengers was likely carrying drugs on his person. These facts, coupled with Jackson's nervous and erratic behavior provided reasonable suspicion to conduct the pat-down search. Thus, the officers were within their authority when they raised Jackson's shirt and discovered the cocaine taped to his waist.

**Analysis**

The facts establish, and the authorities cited above confirm, that the stolen firearm in this case was recovered during a consensual encounter between Agent Sharpley and Defendant. Up until the moment that Defendant admitted he had a gun in his backpack and Defendant was handcuffed, there was nothing coercive or restrictive about any of the actions taken by law enforcement at the bus station. All of the officers were in plain clothes and they did not display or brandish any weapons. Lt. Townley entered the bus with permission of the bus driver (and bus station management) and advised the passengers of their presence and asked for (but did not demand) their cooperation.

Lt. Townley made no direct contact with Defendant while Defendant was on the bus. In fact, Lt. Townley did not order the passengers to disembark. That request was made by the bus driver in an effort to prevent theft or pilfering of carry-on luggage. There was no testimony that the bus driver's request was made at the direction or even suggestion of the police. Accordingly, the Fourth Amendment was not violated when the bus driver asked Defendant (and the other passengers) to exit the bus.

Agent Sharpley's encounter with Defendant, which occurred about 20 feet from the door of the bus, also did not violate the Fourth Amendment. That encounter was purely consensual. Agent Sharpley (and the other officers) displayed no weapons and used no show of force. Agent Sharpley simply approached Defendant in a public area and asked permission to speak with him. Defendant then voluntarily engaged in conversation with Agent Sharpley. At no point during the encounter did Defendant inform the officers that he did not wish to speak with them. See United States v. Garcia, 34 Fed. Appx. 963 (5th Cir. 2002)(finding consensual a similar airport encounter).

During the consensual encounter, Agent Sharpley asked Defendant if he had anything illegal in the backpack, and Defendant claimed that the backpack did not belong to him. ("It's not mine." Tr. 57.) In fact, Defendant placed the backpack on the ground and stepped away from it. Defendant's statements denying ownership of the backpack and his movement away from it constitute an abandonment of the backpack. Agent Sharpley's warrantless search of the backpack did not violate the Fourth Amendment, as any expectation of privacy in the

item was forfeited when Defendant denied ownership of the bag and abandoned it. United States v. Johnson, 2008 WL 3876550 at *4 (5th Cir. 2008)("This court has held that a defendant who abandons or disclaims ownership of a suitcase has no legitimate expectation of privacy in that suitcase or its contents and, therefore, cannot challenge a search of that suitcase."); United States v. Anderson, 2009 WL 3698435 (E.D. Mo. 2009) (collecting similar cases).

As Agent Sharpley bent over to touch the backpack, Defendant blurted out that a gun was in the backpack. At that point, Defendant was handcuffed and taken into custody for the illegal carrying of a concealed weapon. It was not until that moment – when Defendant admitted possession of a concealed firearm – that Defendant was seized and the encounter was no longer consensual. However, Defendant's admission provided the officers with probable cause to effect his arrest. Because the officers had probable cause to effect Defendant's arrest, they were well within their rights to move Defendant to the baggage handling room to get away from the noise and fumes of the bus.

**Conclusion**

The stolen firearm was recovered from Defendant's backpack pursuant to a consensual encounter between the officers and Defendant during which Defendant disclaimed ownership of (and abandoned) the backpack. No constitutional rights of Defendant were violated during the encounter. Accordingly, there is no basis to suppress the evidence that Defendant was carrying the stolen firearm in his backpack.

There also is no basis to suppress any of Defendant's statements. Defendant does not contend that any of his incriminating statements – all of which were post-Miranda – were not freely and voluntarily made. Defendant seeks to suppress those statements solely on the argument that they are fruit of the poisonous tree, i.e., the result of an illegal seizure. Having found that the firearm was discovered pursuant to a consensual encounter, there is no basis to suppress any of Defendant's statements.

Accordingly,

**IT IS RECOMMENDED** that Defendant's Motion to Suppress (Doc. 25) be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b). A party may respond to another party's objections within **seven (7) days** from the filing of the objections. Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 2nd day of September, 2010.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE